JUDGE CASTEL

# 09 CIV 3553

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CHICAGO INDOOR LACROSSE TEAM,
LLC d/b/a CHICAGO SHAMROX,

        Plaintiff,              NO.:

v.

NATIONAL LACROSSE LEAGUE, INC.,

        Defendant.



---

## VERIFIED COMPLAINT

Plaintiff, Chicago Indoor Lacrosse Team, LLC, d/b/a the Chicago Shamrox, by and through its counsel, Archer & Greiner, P.C., as and for its Complaint against the defendant, National Lacrosse League, Inc., alleges as follows:

## INTRODUCTION

1.     Plaintiff is a franchise member of the National Lacrosse League. The League is a monopolist controlling one hundred percent of the market for professional indoor lacrosse franchises in the United States and Canada. The League is not a benevolent monopolist; it has used its monopoly power to destroy the plaintiff's franchise and, absent injunctive relief, will be terminating plaintiff's franchise rights in the League today, April 7, 2009.

2.     The League is dysfunctional, to be sure. It induced Plaintiff to purchase a franchise based on false statements regarding the financial health of the League and its teams and the value of its franchises; after the purchase, the League convinced Plaintiff to inject more capital into the team to keep it operational so that the team could be sold profitably, when in fact

the League's intention was to maintain and increase artificially the membership fee the League could charge for franchises; the League restricted Plaintiff's ability to market its team for sale, even though Plaintiff was in dire financial straights, again so the League could maintain artificially high prices for its franchises; the League prohibited Plaintiff from selling its franchise to buyers who wanted to relocate the team to another city, where there were no existing or planned League franchises; and it applied the terms of its governing Constitution in an arbitrary and discriminatory manner, all of which bring us to today, the day on which the League intends to terminate Plaintiff's franchise rights in the League.

3.      This termination, if permitted to proceed, will result in immediate and irreparable harm to Plaintiff, namely the loss of its franchise.  Therefore, Plaintiff is seeking, through this Verified Complaint and accompanying application for a Temporary Restraining Order, both temporary and permanent injunctive relief in the form of an Order:

(a)      Enjoining the League from terminating Chicago Lacrosse's membership in the League;

(b)      Enjoining the League from enforcing certain sections of its Constitution which are anti-competitive; and

(c)      Enjoining the League from interfering with Chicago Lacrosse's sale of its franchise.

4.      Plaintiff also seeks, through this Verified Complaint, compensatory damages, punitive damages, treble damages, attorneys' fees and costs of suit, and such other relief the Court may deem just and equitable.

## THE PARTIES

5.        Plaintiff, Chicago Indoor Lacrosse Team, LLC ("Chicago Lacrosse"), is a limited liability company organized under the laws of the State of Georgia.  Chicago Lacrosse's principal office is currently located at One Live Oaks Center, in Atlanta, Georgia.  Chicago Lacrosse, when operating, did business as the Chicago Shamrox, a franchise member of the National Lacrosse League, and had a principal place of business located in Hoffman Estates, Illinois.

6.        Defendant, National Lacrosse League, Inc. ("NLL" or "the League"), is a New York corporation with its principal place of business located at 9 East 45th Street, 5th Floor, in New York, New York 10017.  The NLL is an indoor professional lacrosse league with franchise teams operating throughout the United States and in Canada.

## JURISDICTION AND VENUE

7.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1337 (antitrust), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1332 (diversity).

8.        This Court has supplemental jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

9.        Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that the defendant resides in this district.

## FACTUAL BACKGROUND

10.       The National Lacrosse League, Inc. ("NLL" or "the League") is a professional indoor lacrosse league consisting of its member franchises operating in cities throughout the United States and in Canada.

11.     The League markets its franchises in all fifty states and in Canada.

12.     In 2005, in response to such marketing, Chicago Lacrosse applied to the League for an expansion franchise.

13.     On January 11, 2006, the League approved Chicago Lacrosse's application to purchase an expansion franchise. See Exhibit 1.

14.     The purchase price for the franchise was $3,000,000.00, to be paid pursuant to a payment plan established by the parties.

15.     Chicago Lacrosse played its inaugural season in 2007.

16.     That season proved to be a financial disaster for Chicago Lacrosse, and the team lost a substantial amount of money.

17.     Chicago Lacrosse immediately, during the 2007 season, advised the League of its financial difficulties and sought assistance.  The League failed to provide any such assistance.

18.     Instead, the League advised Chicago Lacrosse that the League had a number of potential purchasers just waiting for a franchise, and that Chicago Lacrosse should continue in operation so as to maintain the value of its franchise to potential purchasers.  The League also represented that Chicago was "next in line" for one of the potential purchasers.

19.     These representations started in 2007 and continued through 2008.

20.     Based on these representations, Chicago Lacrosse continued to operate its franchise, which included investing more money into its operations.

21.     The team continued to lose money, however.

4

22.     Chicago Lacrosse continued to keep the League fully apprised and informed regarding its rapidly deteriorating financial condition, and continued to ask for assistance.  No assistance was forthcoming.

23.     Following the 2007 season, Chicago Lacrosse placed the team up for sale and so advised the League.

24.     However, the League restricted the ability of Chicago Lacrosse to advertise that its franchise was for sale, for fear of the negative publicity such advertisement would bring to the League and the negative effect it would have on the prices the League and its members could command for a franchise.  That is, such advertisement and marketing would have resulted in lower franchise sales prices.

25.     As a result, the team was restricted in its ability to market and sell its franchise, and the League and its members were able to maintain artificially high franchise membership fees and sales prices.

26.     Thereafter, on August 23, 2007, as Chicago Lacrosse continued to search for a buyer for its franchise, the League wrote to Chicago Lacrosse advising that it was in violation of the League Constitution because of monies owed to the League related to the $3,000,000 membership fee (i.e., there remained $450,000 due) and outstanding invoices to vendors and other third parties.  See Exhibit 2.

27.     In its August 23 correspondence, the League gave Chicago Lacrosse seven days to respond, and explained that a "special meeting of the Board of Governors will be called to hear the charges and the Board of Governors may vote with respect to suspending or terminating your membership in the league. . . ."  Id.

28.     Chicago Lacrosse responded in writing on August 27, 2007.

29.     In its response, a copy of which is attached hereto as Exhibit 3 and incorporated herein, the team gave a detailed report of its operations to date and the financial difficulties it had encountered.

30.     It also detailed its frustrations and concerns with the League, including the complete lack of support or assistance from the League, despite the League knowing that the team's ownership group had never before owned or operated a professional sports franchise and despite the League's promise to provide such support and assistance; the seemingly false or misleading information from the League regarding the financial health of other teams in the League (the League represented that 75 percent of the teams were at "break even" or were profitable) and the financial health of the League, which Chicago Lacrosse was advised operated at a surplus every year (which was false); and the representation that the League had already changed the expansion fee for new franchises from $3,000,000 to $5,000,000 (which was false).

31.     The League held a hearing at which time it was decided not to suspend involuntarily the franchise rights of Chicago Lacrosse.

32.     Thereafter, the team continued to look for a buyer for its franchise.

33.     Beginning in or around April of 2008, the League began to assist with locating a buyer for the franchise and introduced Chicago Lacrosse to a number of potential buyers and investors from around the country, including people interested in fielding a team in other cities, including Cleveland and Tampa Bay.

34.     The League actively encouraged Chicago Lacrosse to sell its franchise to ownership groups both in Chicago and in other cities.

35.     To that end, the League introduced Chicago Lacrosse to Sports Capital Partners ("SCP"), which owns, among other things, National Hockey League's St. Louis Blues and Major League Soccer's Real Salt Lake, and tried to broker a deal between the parties whereby SCP would purchase the franchise and move it to St. Louis.

36.     Since Chicago Lacrosse desperately wanted to sell its franchise, it offered the franchise to SCP on very favorable, "fire sale" terms.

37.     The sale of Chicago Lacrosse's franchise would have benefited the League greatly because (a) absent the sale, Chicago Lacrosse would have continued to be one of the financially weakest franchises in the League and its viability would have been jeopardized; and (b) if sold to SCP, the franchise would be going to a buyer with considerable market experience and a high visibility platform for the team and for the League.

38.     After putting together a closeable sale with SCP, Chicago Lacrosse was advised by the League that there was one "hurdle" the team needed to clear to proceed with the sale. The team needed to apply to the League to modify a requirement in the League Constitution, found at Section 4.4, that permits a team to transfer its home territory only after it has operated in its current location for three years. The Shamrox had played only two seasons in Chicago.

39.     Chicago Lacrosse discussed this requirement with the League, and was told that it was a "mere formality" and asked Chicago Lacrosse simply to write a short note explaining the situation and asking for an amendment to the Constitution to permit the sale to SCP to proceed.

40.     On May 24, 2008, Chicago Lacrosse did as requested and sent a note to the League explaining the situation and requesting relief from Section 4.4. See Exhibit 4.

41.     On May 27, 2008, the League, through its representative George Daniel, asked Chicago Lacrosse to modify its request slightly, which it did.

42.     That same day, Mr. Daniel advised Chicago Lacrosse that the League's Expansion Committee was not recommending Chicago Lacrosse's request to the League's Board of Governors, such that the sale to SCP would not be able to proceed.  See Exhibit 5.

43.     Ultimately, the Board of Governors rejected Chicago Lacrosse's request and the deal with SCP was terminated as a result.

44.     Because of the League's action in rejecting this request, Chicago Lacrosse lost the benefit of the sale of its franchise to SCP.

45.     Also at this time, as the team continued to experience financial difficulties, Chicago Lacrosse kept the League apprised of its financial difficulties and the team's representatives spoke frequently with the League to discuss their options, including whether to suspend operations and go dormant or sell the team.

46.     The League's advice was that Chicago Lacrosse should remain active and operational, even through the team was hemorrhaging money with no real prospects of recovery and no assistance forthcoming from the League.

47.     With the 2009 season fast approaching, Chicago Lacrosse wrote to the League on December 5, 2008 advising that "the viability of our franchise has been for some time in serious jeopardy, and its demise now appears, absent particularly good fortune, to be imminent. . . . Unless we are able to obtain an interested buyer or significant new investment in the immediate future, we will be compelled to cease the operations of the Shamrox." See Exhibit 6.

48.     In response to this letter, on December 8, 2008, the League advised Chicago

Lacrosse as follows:

> As you know, by notifying the NLL of your intent to suspend
> operations, your club's membership is automatically terminated in
> accordance with the National Lacrosse League Constitution
> Section 3.12 which provides:
>
> > *Section 3.12 Involuntary Termination*
> >
> > *(a)     The membership of a Member Club shall terminate
> > automatically if it shall do or suffer any of the following:*
> >
> > *(iii.)     Disband its team during the League season or play-
> > offs, disband its business organization, or cease its
> > business. This shall include any member club that notifies
> > the league of its intention to suspend operations for the
> > upcoming season after June 1 or fails to secure a facility
> > lease to play games at a facility suitable to the league at
> > any time after the release of the league's schedule.*

See Exhibit 7.

49.     The League also advised Chicago Lacrosse that, in light of its December 5 letter,

it was required to sell its franchise within 120 days of December 8, 2008:

> Pursuant to Section 3.15 of the NLL Constitution, you are hereby
> directed to sell your membership within 120 days.
>
> . . .
>
> In the event the membership interest has not been transferred in
> accordance with Section 3.6 within 120 days from the date such
> action was ordered, the ownership interest shall revert to and vest
> in the League and member shall have no further ownership rights
> in the League or said membership.

Id.

50.     In response to this directive, by letter dated December 11, 2008, Chicago
Lacrosse correctly advised the League that it had not given notice that it was disbanding its
operations and thus the 120-day sales period had not commenced.  See Exhibit 8.

51.     Nevertheless, given the many missed promises and misrepresentations of the
League, and the team's dismal financial state, the team determined to cease its business
operations and so advised the League on December 11.  Id.

52.     The team therefore agreed that the 120-day sale period would commence on
December 11, 2008, meaning that the team had until April 10, 2009 to sell its franchise.  Id.

53.     During this 120-day period, Chicago Lacrosse identified a buyer for its franchise.

54.     The buyer, an ownership group led by Curt Styres and Steve Donner ("the Donner
Group"), signed a Letter of Intent to purchase the Shamrox franchise for $1.5 million.

55.     The Donner Group intended to move the team to Orlando to open the 2010
season.

56.     The League did not at that time, and still does not, have an Orlando franchise.

57.     However, before closing on the transaction, the League contacted the Donner
Group and told them not to deal with Chicago Lacrosse because the League would not approve
the transaction.  This was before Chicago Lacrosse ever made application to the League for
approval of the transaction.

58.     As a result, the transaction terminated shortly thereafter.

59.     Unbeknownst to Chicago Lacrosse at the time, the team later learned, and
therefore alleges upon information and belief, that, when the League contacted the Donner

Group and advised it not to do business with Chicago Lacrosse, the League also offered to sell an expansion franchise to the Group.

60.     The reason the League made this offer was that, with the sale of an expansion team, the League realizes the entire membership fee, for example $5,000,000, and splits this fee among the League members. By contrast, in the sale of an existing franchise, the League and its members receive only a ten percent transfer fee, which, even for a $5,000,000 transaction, would be only $500,000.

61.     Upon information and belief, the League has interfered in this same manner on other sales of NLL franchises, including but not limited to the sale of the expansion Portland franchise.

62.     The League has an economic incentive and interest in selling expansion franchises to the exclusion of facilitating sales of existing franchises.

63.     With the League's interference and resulting demise of the Donner Group transaction, which would have closed within the 120-day sales period required by Section 3.15 of the League Constitution, Chicago Lacrosse lost the benefit of the 120-day period and is now faced with the complete loss of its franchise on April 7, 2009.

## FIRST COUNT

### (Violation of the Section 2 of the Sherman Act, 15 U.S.C. § 2)

64.     Chicago Lacrosse repeats and incorporates the foregoing allegations.

65.     The relevant product market is professional indoor lacrosse team franchises, and the relevant geographic market is the United States and Canada (together, "the relevant market").

66.     The League has monopoly power in the relevant market.  In fact, it has 100 percent market share, and has the power to control prices for its franchises and/or to exclude competition.

67.     The League enjoys a monopoly in the sale and re-sale and transfer of professional indoor lacrosse franchises in the United States and Canada.

68.     The League has maintained its monopoly power and position through anti-competitive conduct.  For example, and not by way of limitation:

(a)     Section 3.15 of the League Constitution prohibits a franchise owner from applying to transfer its team to any other city unless and until the team completes three seasons in the city for which its franchise was approved, regardless of the financial or market conditions the team may be experiencing;

(b)     Given the application of Section 3.15, the League Constitution prohibits a franchise owner from selling its team to any person or entity who wishes to operate the franchise in another city;

(c)     In this case, the League applied Section 3.15 to destroy both the SCP transaction and the Donner Group transaction, which resulted in Chicago Lacrosse losing the benefits of these transactions;

(d)     The League prohibited Chicago Lacrosse from advertising or marketing that its franchise was for sale;

(e)     The League's revenue model prefers greatly the sale of expansion franchises to the sale of existing franchises; and

(f)     The League employed its expansion franchise revenue model in this case to interfere the Donner Group transaction.

69.     These activities enabled the League and its members, among other things, to maintain artificially high League membership fees and franchise sale prices and prevented Chicago Lacrosse from selling its franchise.

70.     The League's activities, as more fully alleged above, occurred in or affected interstate and/or foreign commerce in that, among other things, the activities have affected market participants in many different states and in Canada and have involved the business of the NLL, which is conducted in nearly all 50 states and in Canada.

71.     Chicago Lacrosse was injured in its business and/or property because of the League's anti-competitive conduct, as more fully alleged above, including the loss of the benefits of the two transactions referenced herein (the SCP deal and the Donner Group deal) and will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

  (a)     Terminating Chicago Lacrosse's membership in the League;

  (b)     Enforcing Section 3.15 of the League Constitution;

  (c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Treble damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## SECOND COUNT

### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

72.     Chicago Lacrosse repeats and incorporates the foregoing allegations.

73.     The League Constitution is a contract between and among the League and its member franchises.  Section 3.17 of the Constitution confirms this fact:

> By their approval and adoption of this Constitution and the By-Laws, Regulations and Policies enacted or adopted pursuant hereto and, in the case of new member of transferee Member Clubs, by their acceptance to own a Member Club within the National Lacrosse League with its attendant obligations as herein set forth, each Member Club shall be deemed to have contracted with every other Member Club and with the League to perform in accordance with this Constitution and the By-Laws and Regulations adopted pursuant hereto and to comply with the League policies as adopted from time to time.

See Exhibit 9 at Section 3.17 (emphasis added).

74.     Section 3.15 of the Constitution prohibits a member franchise from applying to transfer its team to another city without first playing for three seasons in its home city, and concomitantly prohibits such transfers altogether.

75.     Such a restriction on the transferability of franchises is anti-competitive in that it completely restricts a League member from selling its franchise to any purchaser wishing to operate the franchise in another city, even a city that does not have an NLL franchise.

76.     The Constitution does not provide for waivers or exceptions to the restrictions of Section 3.15.

77.     The agreement between and among the League and its members harms competition in the sale and re-sale of franchises in the relevant market and otherwise unreasonably restrains trade in the relevant market.

78.     In this case, this unlawful agreement prevented Chicago Lacrosse from selling its franchise to any purchaser who to wished operate the franchise in another city, even a city that does not have an NLL franchise, including SCP and the Donner Group.

79.     The harmful affect of this unlawful agreement on competition outweighs any beneficial effect on competition.

80.     This agreement affects interstate and/or foreign commerce in that, among other things, the agreement was between parties in different states and different countries (the U.S. and Canada) and involved the business of the NLL, which is conducted in nearly all 50 states and in Canada.

81.     Chicago Lacrosse was injured in its business and/or property because of the above described agreement, including the loss of the benefits of the two transactions referenced herein (the SCP deal and the Donner Group deal) and will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

        (a)     Terminating Chicago Lacrosse's membership in the League;

        (b)     Enforcing Section 3.15 of the League Constitution;

        (c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Treble damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## THIRD COUNT

### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

82.     Chicago Lacrosse repeats and incorporates the foregoing allegations.

83.     The League and its members agreed to the following revenue model:

        (a)     Upon the sale of an existing franchise, the League will receive a transfer fee equal to ten percent of the sale price;

        (b)     Upon the sale of an expansion (new) franchise, the League will receive a membership fee equal to the entire sale price.

84.     The League realizes a significant benefit in the sale of expansion franchises.

85.     The membership fee for expansion franchises in 2008 was $5,000,000. Upon a sale, the $5,000,000 would be split equally among the owners of the League. By contrast, if an owner sells its existing franchise for $5,000,000, the League receives only $500,000 to split among the owners.

86.     The League and its members have a significant incentive to sell new franchises and avoid the sale of existing franchises.

87.     The League and its members have acted in accordance with this incentive and its agreement by preferring new franchise sales over existing franchise sales.

88.     This is what occurred with the Donner Group sale.  The League contacted the Donner Group and advised that they [the League and its members] would not approve the Chicago Lacrosse sale and instead offered to sell a new franchise to the Donner Group.

89.     The agreement of the League and its members to employ the above described revenue model, and its actions in using this model to prevent the sale of the Chicago Lacrosse franchise, harm, and continue to harm, competition, and have specifically harmed Chicago Lacrosse.

90.     The agreement between and among the League and its member owners is anti-competitive in that it harms competition in the sale and re-sale of franchises in the relevant market and otherwise unreasonably restrains trade in the relevant market.

91.     The harmful affect of this unlawful agreement on competition outweighs any beneficial effect on competition.

92.     This agreement affects interstate and/or foreign commerce in that, among other things, the agreement was between parties in different states and different countries (the U.S. and Canada) and involved the business of the NLL, which is conducted in nearly all 50 states and in Canada.

93.     Chicago Lacrosse was injured in its business and/or property because of the above described agreement, including the loss of the benefits of the Donner Group sale and will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

       (a)     Terminating Chicago Lacrosse's membership in the League;

       (b)     Enforcing Section 3.15 of the League Constitution;

       (c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Treble damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## FOURTH COUNT

### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

94.     Chicago Lacrosse repeats and incorporates the foregoing allegations.

95.     The League and its members agreed on a restriction against free advertising or marketing the sale of distressed franchises, such as Chicago Lacrosse's franchise.

96.     Such agreement was designed to, and did in fact, enable the League to maintain artificially high membership fees and franchise sale prices.

97.     The League and its members have acted in accordance with this agreement by, among other things, prohibiting Chicago Lacrosse from advertising or marketing the sale of its franchise.

98.     This agreement harms, and continue to harm, competition, and has specifically harmed Chicago Lacrosse.

99.     The agreement between and among the League and its member owners is anti-competitive in that it harms competition in the sale and re-sale of franchises in the relevant market and otherwise unreasonably restrains trade in the relevant market.

100.    The harmful affect of this unlawful agreement on competition outweighs any beneficial effect on competition.

101.    This agreement affects interstate and/or foreign commerce in that, among other things, the agreement was between parties in different states and different countries (the U.S. and Canada) and involved the business of the NLL, which is conducted in nearly all 50 states and in Canada.

102.    Chicago Lacrosse was injured in its business and/or property because of the above described agreement, and will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)    An Order preliminarily and permanently enjoining the League from:

      (a)    Terminating Chicago Lacrosse's membership in the League;

      (b)    Enforcing Section 3.15 of the League Constitution;

      (c)    Interfering with Chicago Lacrosse's sale of its franchise;

(2)    Compensatory damages;

(3)    Treble damages;

(4)    An award of attorney's fees and costs of suit;

(5)    Such other and further relief as the Court deems just and equitable.

## FIFTH COUNT

### (Tortious Interference with Contract and Prospective Economic Advantage)

103.    Chicago Lacrosse repeats and incorporates the foregoing allegations.

104.    Chicago Lacrosse had a reasonable expectation of a contract to sell its franchise to SCP.

105.    The League was aware of this contract expectation, as the League brokered the transaction.

106.    Chicago Lacrosse had a reasonable expectation of a contract to sell its franchise to the Donner Group.

107.    The League was aware of this contract expectation.

108.    The League interfered with both transactions.

109.    First, with the SCP transaction, the League permitted the transaction to proceed almost to closing only to interject at the last minute that it would not allow the transaction to proceed, claiming that the reason for this decision was the "three season" requirement of Section 3.15 of the Constitution, and specifically rejected Chicago Lacrosse's request for relief from Section 3.15 given its rapidly deteriorating financial condition.

110.    Second, with the Donner Group transaction, the League interfered by contacting the Donner Group directly and advising the Group not to do business with Chicago Lacrosse because the League would not approve the transaction and by offering an expansion franchise to the Group.

111.    This interference was malicious and without justification or excuse.

112.    As a result of this interference, Chicago Lacrosse has been harmed, including but not limited to losing the benefits of the SCP and Donner Group transactions, and will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

        (a)     Terminating Chicago Lacrosse's membership in the League;

        (b)     Enforcing Section 3.15 of the League Constitution;

        (c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Punitive damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## SIXTH COUNT

### (Breach of Contract and the Implied Duty of Good Faith and Fair Dealing)

113.    Chicago Lacrosse repeats and incorporates the foregoing allegations.

114.    The League Constitution is a contract between and among the League and its member franchises.

115.    The League has breached this contract, and the duty of good faith and fair dealing implied in the contract, by, among other things, the following:

        (a)     Applying the terms of the Constitution arbitrarily and discriminatorily;

        (b)     Applying the terms of the Constitution to terminate the franchise rights of Chicago Lacrosse, when the League has not applied such terms to other franchises or has relaxed such terms so as not to terminate franchise rights or at least permit a reasonable opportunity for such rights to be sold;

          (c)      Applying the terms of the Constitution to deny Chicago Lacrosse a fair and reasonable opportunity to sell its franchise;

          (d)      Refusing to allow Chicago Lacrosse to advertise or market its franchise for sale;

          (e)      Brokering transactions for the sale of the Chicago Lacrosse franchise with buyers wishing to relocate the franchise, knowing that the League would not approve any such transactions;

          (f)      Advising the Donner Group not to do business with Chicago Lacrosse because the League would not approve the transaction;

          (g)      Advising the Donner Group not to do business with Chicago Lacrosse because the League would not approve the transaction and then offering an expansion franchise to the Donner Group; and

          (h)      Employing a revenue model that favors the sale of new franchises over existing franchises.

116.    As a direct and proximate result of these breaches, Chicago Lacrosse has been harmed, and, absent injunctive relief, will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)    An Order preliminarily and permanently enjoining the League from:

          (a)      Terminating Chicago Lacrosse's membership in the League;

          (b)      Enforcing Section 3.15 of the League Constitution;

          (c)      Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     An award of attorney's fees and costs of suit;

(4)     Such other and further relief as the Court deems just and equitable.

## SEVENTH COUNT

### (Fraud)

117.    Chicago Lacrosse repeats and incorporates the foregoing allegations.

118.    The League made numerous representations to Chicago Lacrosse just before it purchased its franchise and to induce it to purchase its franchise, including the following:

(a)     That 75 percent of the teams were at "break even" or were profitable;

(b)     That the League operated at a surplus every year; and

(c)     That the League had approved an increase in its franchise membership fee from $3,000,000 to $5,000,000, and that Chicago Lacrosse was "getting in" at the lower number.

(2)     The League also made the following representations to Chicago Lacrosse after it had purchased its franchise and when it was experiencing financial difficulties:

(a)     That the League had a number of potential purchasers just waiting for a franchise;

(b)     That Chicago Lacrosse was "next in line" for a purchaser;

(c)     That the League would assist with the sale of the Chicago Lacrosse franchise, including introducing qualified buyers to Chicago Lacrosse; and

(d)     That the approval for the transfer of the franchise to St. Louis was a "mere formality."

119.    These latter representations started in March 2007 and continued through 2008.

120.    Based on the former set of representations, Chicago Lacrosse purchased its franchise.

121.    Based on the latter set of representations, Chicago Lacrosse continued to operate its franchise, which included investing more money into its operations.

122.    All of these representations, when made, were false or were made with reckless disregard for whether they were true or false.

123.    The League intended Chicago Lacrosse to rely on these representations.

124.    Chicago Lacrosse did, in fact, rely on the League's representations.

125.    For example, as to the first set of representations above, Chicago Lacrosse relied, to its detriment, by purchasing a franchise from the League.

126.    As to second set of representations, Chicago Lacrosse relied, to its detriment, by committing its resources to continue the operations of the team.

127.    Chicago Lacrosse's reliance as to both sets of representations was reasonable.

128.    As a result of the League's representations, and Chicago Lacrosse's reasonable reliance, Chicago Lacrosse has been harmed and, absent injunctive relief, will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

       (a)     Terminating Chicago Lacrosse's membership in the League;

       (b)     Enforcing Section 3.15 of the League Constitution;

       (c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Punitive damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## EIGHTH COUNT

### (Unfair Competition)

129.    Chicago Lacrosse repeats and incorporates the foregoing allegations.

130.    The League competes in the sale of franchises with its members, and specifically competed with Chicago Lacrosse with regard to the sale of its franchise.

131.    The League's competition with Chicago Lacrosse was unfair and therefore unlawful in the following ways:

       (a)     The League used Section 3.15 of the Constitution to quash the SCP sale;

       (b)     The League used Section 3.15 of the Constitution and the offer of a new, expansion franchise to interfere with and ultimately derail the Donner Group transaction;

       (c)     The League advised the Donner Group not to do business with Chicago Lacrosse because the League would not approve the transaction;

(d)     The League advised the Donner Group not to do business with Chicago Lacrosse because the League would not approve the transaction and then offered an expansion franchise to the Donner Group;

(e)     The League brokered transactions for the sale of the Chicago Lacrosse franchise with buyers wishing to relocate the franchise, knowing that the League would not approve any such transactions;

(f)     The League convinced Chicago Lacrosse to remain operational and commit considerable additional resources to the team, knowing that it was in serious financial trouble, for the sole purpose of maintaining artificially high membership fees and member sales prices;

(g)     The League employed a revenue model that favors the sale of new franchises over existing franchises.

132.    As a direct and proximate result of such acts, Chicago Lacrosse has suffered harm and, absent injunctive relief, will be irreparably harmed upon the expiration of the 120-day sale period referenced above when Chicago Lacrosse will lose its franchise altogether.

**WHEREFORE,** plaintiff Chicago Lacrosse respectfully requests the following relief:

(1)     An Order preliminarily and permanently enjoining the League from:

(a)     Terminating Chicago Lacrosse's membership in the League;

(b)     Enforcing Section 3.15 of the League Constitution;

(c)     Interfering with Chicago Lacrosse's sale of its franchise;

(2)     Compensatory damages;

(3)     Punitive damages;

(4)     An award of attorney's fees and costs of suit;

(5)     Such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

ARCHER & GREINER
A Professional Corporation

By:  ALEXANDER NEMIROFF, ESQ.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, New Jersey 08033

Dated: April 7, 2009

*Of Counsel:*

Joseph A. Martin, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, New Jersey  08033
Tel. (856) 795-2121
Fax (856) 795-0574

Anthony R. Caruso, Esq.
ARCHER & GREINER, P.C.
700 Alexander Park, Suite 102
Princeton, NJ 08540
Tel. (609) 580-3700
Fax (609) 580-0051

## VERIFICATION

Pursuant to 28 U.S.C. §1746, and under penalty of perjury, I hereby verify as follows:

1.    I am the owner of Chicago Indoor Lacrosse Team, LLC ("Chicago Lacrosse").

2.    In that capacity, I am authorized to make this verification on behalf of Chicago Lacrosse.

3.    I have read the allegations contained above, and that, as to those which are not based upon "information and belief," such allegations are true and correct.

DONALD SALLEE

Executed on April 7, 2009

3857771v1